## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Clinton Cox,                    )
   Petitioner              )
                       )
                       )    **Crim. No. :**  3:00CR69 (AHN)
    vs                          )    **Civil No. :**
                       )
UNITED STATES OF AMERICA,        )
          Respondent    )

### MEMORANDUM OF LAW

**Comes Now** Clinton Cox, hereinafter referred to as "Petitioner", proceeding pro-se, and respectfully submits this memorandum of law in support of the instant motion for relief from judgement, under the All Writs Act of 28 U.S.C. § 1651.  In the alternative this Court should consider relief from judgement pursuant to Federal Rules of Civil Procedure, Rule 60 (b).  In support there-of, Petitioner states the following:

### A. All Writs Act

The All Writs Act includes the writs of error coram nobis and audita querela.  A motion under this section is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding.  The procedure by motion in the case is now the accepted American practice.  UNITED STATES v MORGAN, 364 U.S. 502, 506 n.4 (1954).  The circumstances of the Petitioner's case justify the issuance of the Writ.

2

B.  Rule 60 (b)

Federal Rules of Civil Procedure, Rule 60 (b) has been defined in Klopprott v. United States, 335 U.S. 601 (1949), as, "[P]ower in courts adequate to enable them to vacate judgements whenever such action is appropriate to accomplish justice."

The policy rationale of Rule 60 (b) connotes reopening the decree denying the original section 2255 motion.  Petitioner is not presenting new and/or additional claims for relief from the underlying convictions or sentences, he seeks only to have the section 2255 court consider applying the correct statutory interpretation and the correct standard of review.  See, Gonzalez v. Crosby, 162 L.Ed 2d 480 (2005) (defects in the integrity of Federal Habeas proceedings are clearly applicable on Rule 60 (b) motions).

C.  Suspension of Writ Clause

This Court has previously held that AEDPA's limitations on a prisoner's ability to bring habeas petitions may violate the Suspension of the Writ Clause if they create an "unreasonable burden" to habeas relief.  Rodriguez v. Artuz, 990 F. Supp. 275, 282 (S.D.N.Y.), affd at 161 F. 3rd 763, 724 (2nd Cir. 1998) (per Curiam).

Denial of habeas relief in the present case implicates the Suspension Clause because it constitutes a complete denial of any collateral review of new legal developments that arose after Petitioner filed his initial section 2255 petition in the year of 2004.  Such a denial would be analogous to refusing to hear claims that were erroneously dismissed under the misinterpret-

ation of a criminal statute or an erroneous analysis by the hab-
eas court in a previous habeas petition.  This would raise a
serious constitutional question with respect to the Suspension
Clause.  Cf., In Re Dorsainvil, 119 F. 3rd 245, 248 (3rd Cir.
1997) (If no other avenue of judicial review is available for
a party who claims that s/he is factually or legally innocent
as a result of a previously unavailable statutory interpreta-
tion, we would be faced with a thorny constitutional issue).

D. Preliminary Statement

In United States v. Tenzer, 213 F. 3rd 34, 39 (2nd Cir. 2000)
the Second Circuit held that it is appropriate to reconsider
an earlier decision when confronted with "an intervening change
of controlling law,... or the need to correct clear error or
prevent manifest injustice."  This legal reasoning is supported
by Supreme Court precedent.  In Davis vs. United States, 417
U.S. 333, 342 (1974) the High Court held that the law of the
case doctrine did not preclude a petitioner from seeking § 2255
relief based on a change in the law that occurred after his con-
viction was affirmed on direct appeal.  In Davis, the change
resulted from a decision of the Ninth Circuit, the same Court
that had affirmed Davis' conviction on direct appeal.  The
change in law occurred while Davis' certiorari petition was pen-
ding.  The Supreme Court denied Certiorari in Davis' direct ap-
peal, but granted review after the district court denied Davis'
section 2255 petition.  Id at 339-41.  In determining that Davis'
habeas claims were not barred by the circuit court's decision

4

on direct appeal, the court stated that the result would be dif-
ferent had the change in law occurred while the defendant still
had time to appeal his conviction but failed to do so.  Id at
345.

   The circumstances in Davis are directly analogous to those
here, insofar as the changes in law on which the Petitioner re-
lies occurred after his conviction was final.  It is clear from
the Supreme Court grant of certiorari on Davis' post-conviction
petition that reconsideration is necessary to prevent "manifest
injustice" that results when a defendant is precluded from rais-
ing claims on collateral review when the law has changed.  Thus,
an exception is justified in this case because the application
of new law is necessary to prevent a manifest injustice.  See,
Tenzer, 213 F.3rd at 39.

   In the instant case, subsequently to the Petitioner's convict-
ion, appeal and the filing of his § 2255 motion, on December 10th,
2007, the United States Supreme Court issued an opinion in Watson
v. United States, 128 S.Ct. 579, 586 (2007), in which the Court
held that "a person does not 'use' a firearm under § 924 (c)(1)
(A) when he receives it in trade for drugs."  Given the facts of
this case, the Court should re-open its proceedings to determine
whether Petitioner's conviction under § 924 (c) was supported by
an adequate factual basis, in light of Watson.

### FACTUAL AND PROCEDURAL BACKGROUND

   Brothers Jason and Clinton Cox (the Petitioner) began selling
crack-cocaine in and around Bridgeport, CT, in 1995.  By 1999, they
were dealing throughout the Bridgeport area and as far away as
South Carolina.

Other individuals, often crack addicts, were recruited to help them purchase cocaine and guns, process cocaine into crack, rent and drive cars, and make sales. Their employees included Willie Grant, Thomas Marazita, and Robert Davis. Cox, 324 F.3d at 79.

On April 04, 2000, a federal grand jury in Connecticut indicted Willie Grant and the Cox brothers on various drug and gun charges. After Grant pleaded guilty, the grand jury returned a superceding indictment charging Jason and Clinton Cox with twenty counts of drug and gun offenses under 21 U.S.C. §§ 846 & 841 and 18 U.S.C. §§ 922 & 924. The district court granted a motion by the government to sever and ultimately dismiss felon-in-possession counts brought under 18 U.S.C. § 922(g)(1), and a motion by the government to dismiss one count of possession with intent to distribute.

At a jury trial on the remaining counts, conducted January 23, 2001, the government offered, among other things, the testimony of (i) Grant, Marazita, and Davis, all of whom had pleaded guilty and testified pursuant to cooperation agreements; (ii) undercover officers who purchased crack from Jason Cox in 1998 and 2000; and (iii) officers who recovered 397 grams of crack from a rental car in which the Cox's were pasengers. The jury convicted on all counts.

On May 17, 2001, Jason Cox was sentenced to 420 months in prison, ten years of supervised release, and a $ 900 special assessment. On September 12, 2001 Clinton Cox was sentenced to 540 months in prison, ten years of supervised release, and a $ 700 special assessment. Both Jason and Clinton Cox filed timely notices of appeal.

On appeal, the Cox's challenged their convictions and sentences on the various drug and firearm convictions on a variety of grounds.

6

In particular, this Court addressed the Cox's pro se argument that
"acceptance of a gun as collateral for the purchase price of drugs
did not constitute 'use' of the gun under 18 U.S.C. § 924(c)(1)."
Cox, 324 F.3d at 80-81. The Court determined that the issue of whether
Cox used or carried the firearm within the meaning of 18 U.S.C. § 924
(c)(1) was not raised at trial and that trial counsel for Jason Cox ac-
quiesced in a jury instruction that an individual who exchanges a con-
trolled substance for a firearm, uses the firearm during and in rela-
tion to a drug trafficking crime. Id., at 81. Although this error of
counsel borders on Sixth Amendment territory and was certainly not in
Cox's best interest, the Court, in any event, analyzed the issue for
plain error as articulated in United States v. Olano, 507 U.S. 725,
732 (1993).

The Court viewed the issue for the Cox's as being whether they
"carried" or "used" a gun during and in relation to his drug traffic-
king offense by accepting the gun as collateral for the price of drugs.
In first addressing the "carrying" prong of 924(c)(1) the Court speci-
fically indicated that "to affirm this conviction based on the 'car-
ries' prong of Section 924(c)(1) would tax even the  deferential stan-
dard of review we apply to sufficiency of evidence challenges." Cox,
324 F.3d at 82 citing United States v. Reyes, 157 F.3d 949, 955 (2nd
Cir. 1998).

The statute in question does not define "use" of a firearm. See
18 U.S.C. § 924(c); Smith v. United States, 508 U.S. 223, 228 (1993).
The Supreme Court in Smith determined that the statute, as amended
in 1984, "employed 'use' expansively, to cover both use as  a weapon
and use as an item of barter." Smith, 508 U.S. at 236. Thus, "a

7

criminal who trades his firearm for drugs 'uses' it during and in relation to a drug trafficking offense within the meaning of § 924 (c)(1)." 508 U.S. at 241.

This Court further made clear that "after Smith and Bailey [v. United States, 516 U.S. 137 (1995)], it is settled that one who tenders a firearm as barter for drugs is 'using' it within the meaning of Section 924(c)(1). It is thus settled that the .357 handgun at issue in this case was 'used' by Marazita during and in relation to a drug trafficking offense when he bartered with it to obtain drugs." Cox, 324 F.3d at 83. The Court went on to recognize the quite distinct question of whether the gun was 'used' by Jason Cox during and in relation to a drug trafficking crime when he received it from Marazita - the obverse of the barter transaction at issue in Smith, but ultimately affirmed on the basis that he "used" the gun as collateral for the purchase price of the drugs he sold to Marazita. Id., at 82.

The Panel of this Court recognized that the circuits are divided on the applicability of Section 924(c)(1) to the receipt of a gun in a guns-for-drugs trade, detailing the circuit split in the margin. Cox, supra, 324 F.3d at 83 n.2. However, in declining to enter the fray on the matter, the Court distinguished the facts behind Jason Cox's alleged gun 'use' from the scenario that has split the circuits by focusing a few lines of testimony indicating that "Cox took the gun as collateral for the cash price of drugs, not in barter of one commodity for another." Cox, 324 F.3d at 84. The principle evidence relied upon to establish this point was Marazita's testimony indicating that he gave Jason Cox his gun in exchange for "the dollar equivalent of crack," explaining, in part:

> I would say give me ... 25 or 50 dollars worth of crack,
> I'll pay you tomorrow ... I was basically putting colla-
> teral up for the money that I owed him. So I would give
> him my gun. When I payed for the drugs that I took, he
> would give me back the gun. (R.T. January 18, 2001 at 128).

Although the Court viewed the above scenario to be unique in the caselaw and affirmed on this basis, the evidence surrounding the three counts of § 924(c)(1) charged against Clinton Cox in counts 5, 8, and 11 of the Indictment and are not so distinguishable. To the Contrary, the evidence supporting the 924(c)(1) convictions against Clinton Cox falls squarely within the prior circuit split and to which the Supreme Court has recently held <u>does not constitute a crime</u> under the "use" prong of 924(c)(1)(A). <u>Watson v. United States</u>, 552 U.S. ___, 128 S.Ct. ___, 169 L.Ed. 2d 472 (2007) ("A person does not 'use' a firearm under § 924(c)(1) when he receives it in trade for drugs.").

A review of the testimonial record supporting Clinton Cox's convictions on this issue fully supports the position that his conduct does not support a conviction Under <u>Watson</u>'s interpretation of 924(c)'s 'use' prong. In this respect, Thomas Marazita repeatedly testified that he bought Sturm Ruger nine millimeter handguns for Clinton Cox in exchange for crack cocaine as demonstrated in his testimony as follows:

> Q. And what types of guns did you sell him?
> A. Nine millimeters.
> Q. Did you sell him any other guns, to Mr. Clinton Cox?
> A. No ...
> Q. And did you receive anything in exchange for those guns?
> A. I received drugs for it, crack...

(R.T. January 17, 2001 at 58-59).

9.

Q. And on or about March 11, 1999, did you purchase a gun?
A. Yes, I did.
Q. And for whom did you purchase it?
A. For Clinton.
Q. In exchange for what?
A. Fifty dollars worth of crack cocaine.

(R.T. Jaunary 17, 2001 at 82) (Count V).

Q. After you purchased the gun, what occurred?
A. We exited the store, got back into his car. We drove off.
   I gave him the gun, he gave me $ 50 dollars worth of crack.
Q. Did there come a time when you made another purchase for
   him?
A. The following week...

(R.T. January 17, 2001 at 85) (Count V).

Q. And what date did that purchase occur on?
A. Three-nineteen-ninety-nine ...
Q. And could you describe how that was arranged?
A. Almost in the same fashion as the first. I beeped him,
   he picked me up, we went to the store. He gave me the
   money in the car. I purchased the gun, because this time
   he knew exactly what he wanted and told me he wanted
   another Sturm Ruger nine millimeter. I went into the
   store. I purchased the gun. Like I said, I went in and
   a few minutes later, he came in. He did some shopping,
   whatever. I purchased the gun. We exited the store. We
   got back into his car. He drove me home. I gave him the
   gun. He gave me $ 50 dollars worth of crack.

(R.T. January 17, 2001 at 86 (Count VIII).

Q. Did there come a time when you attempted to purchase
   another gun?
A. Yes.
Q. And can you describe what you did?
A. Probably that following week or two weeks after that, at
   some point I contacted him again and told him that I was
   available to purchase it. When I had purchased the second
   gun for him, he had indicated that he wanted more guns.
   When I became available the following week, I beeped him
   and told him I was availavle and we went to D'Andrea's
   Gun Case.
Q. And what occurred when you went to D'Andrea's Gun Case?
A. They had no more Sturm Rugers. So I did not purchase a
   gun from them.
Q. And did you tell Mr. Cox that?
A. Yes.
Q. And what happened after that?
A. There's another gun store down the street...

10

Q. When you went into K5, describe for us what happened.
A. I went into K5 and asked them if they had any Sturm Ruger nine millimeters. I forgot the exact model name, P95, P85, something to that effect. He indicated that he didn't have any in stock, but he could order them for me and he would have them within a few days. So I ordered two guns...

(R.T. January 17, 2001 at 88) (Count XI).

Q. After you purchased those guns on the 29th, what did you do with them?
A. I turned them over to Clinton.
Q. And did you receive anything for that?
A. Crack cocaine.
Q. How much crack cocaine; do you recall?
A. Fifty dollars...

(R.T. January 17, 2001 at 90) (Count XI).

The cross and redirect examination of Marazita confirms that the evidentiary basis sustaining Clinton Cox's three counts of using a firearm during and in relation to a drug trafficking crime under 924(c)(1) was a "guns for crack cocaine exchange":

Q. And I think you indicated, in essence, that every time you'd purchase a gun and you'd sell it, you would make a profit of roughly $ 50 dollars, and presumably you would get paid that in crack.
A. When I dealt with Jason or Clinton.

(R.T. January 18, 2001 at 54).

Q. And I think what you were telling us through you testimony is that when you purchased these guns, at least the four you claim to have purchased for Clinton Cox, that you were under the impression that he was going to use them somehow in his drug dealing operation, according to you.
A. Was I aware of what he was going to do with the guns?
Q. Right.
A. No, I wasn't aware...
Q. And you purchased these guns for him in return for, according to you, again, crack cocaine.
A. Yes.

(R.T. January 18, 2001 at 83).

Q. And clearly when you bought and sold at least the four and five weapons that are germane to this case, you purchased the weapon illegally, sold it illegally and received crack cocaine illegally in return, correct?
A. Correct.

11

> Q. Here is the ATF form. It is signed or it's dated March
>    11th, 1999. Do you recall making that purchase? Yes. That's
>    your response on direct examination, right?
> A. Yes.
> Q. And what did you do with the gun? I bought it for Clinton
>    in exchange for fifty dollars worth of crack; is that
>    right? Answer, "Yes."
> A. Yes.

(R.T. January 18, 2001 at 120).

On redirect examination:

> Q. And in 1999, did you buy guns?
> A. Yes.
> Q. What type of guns did you buy?
> A. Sturm Ruger nine millimeters.
> Q. And who did you buy those guns for?
> A. I bought those four particular guns for Clinton.
> Q. In exchange for what?
> A. Each gun. I got fifty dollars worth of crack for...

(R.T. January 18, 2001 at 122).

Thus, it appears from the record evidence that Mr. Cox's trade of fifty dollars worth of crack cocaine in exchange for Marazita's purchase of handguns does not constitute use of a firearm during and in relation to the charged drug trafficking offenses within the ordinary or natural meaning of the term "use" in § 924(c)(1) because Cox merely received the firearm and did not in any manner use the firearm as that term is defined by the Supreme Court in Watson.

E.  <u>Argument and Authority In Support of Reconsideration</u>

   I.  Judgement in this case should be re-opened so that
       the Court can apply the correct statutory interpret-
       ation of 18 U.S.C. § 924 (c), <u>as created by Congress.</u>

The specific facts of this case, including the collective
misinterpretation of the statutes by all parties, the late
discovery of the correct interpretation, and the subsequent
acceptance of those interpretations by the Government weighs
to compel reconsideration in this case.

   The error committed in this case was not only a miscarriage
of justice, but it was an error that affected the court's
judgement.  Thus, the failure to correct it will result in a
blatant miscarriage of justice.  See, United States vs. <u>Pre-</u>
<u>vatte</u>, 16 F.3rd 767, 783 (7th Cir. 1994); see also, <u>Robinson</u>
<u>vs. United States</u>, 313 F.2nd 817, 821 (7th Cir. 1963) (holding
that exceptional circumstances demand relief where judge acted
under a misapprehension of the law-- the judgement must be
corrected).

   In the present case, Petitioner submits that the supervening
change in the scope and application of § 924 (c) (1) as arti-
culated by the Supreme Court in <u>Watson v. United States</u>, 552
U.S. ____, (2007) indeed constitutes an extraordinary circum-
stance justifying the Court's reconsideration of its mandate
in <u>United States v. Cox</u>, 324 F.3rd 77 (2nd Cir. 2003) not only
because <u>Watson</u> is an intervening change in substantive law
that seriously calls into question the continued validity of
the Court's judgement and whether the Court's judgement has re-

13

sulted in the conviction and punishment of Petitioner for an act that the law does not make criminal, but also, under circumstances such as those present here, a failure to re-open the case on this gun issue would constitute a complete miscarriage of justice.

Turning to the Supreme Court's interpretive decision in Watson, the Court granted certiorari to resolve a conflict among the circuits on whether a person "uses" a firearm within the meaning of 18 U.S.C. § 924 (c)(1)(A) when he trades narcotics to obtain a gun, holding that he does not.  The Court explained that the Government's position that Watson "used" the pistol under § 924(c)(1) by receiving it for narcotics, the converse of the facts in the Court's Smith v. United States, 508 U.S. 223 (1993) decision lacks authority in either precedent or regular English.  Id.  The Court further stated that neither Smith nor Bailey implicitly decided the case, holding: "While Smith held that firearms may be 'used' in a barter transaction, even with no violent employment, (see, 508 U.S. 241), the case addressed only the trader who swaps his gun for drugs, not the trading partner who ends up with the gun."  Watson, 169 L.Ed 2d at 476.  "Bailey, too, is unhelpful, with its rule that a gun must be made use of actively to satisfy § 924 (c)(1) (A), as 'an operative factor in relation to the predicate offense'".  Id., quoting Bailey, 516 U.S. at 143.

In summation, Petitioner asserts that re-opening the case to reconsider the argumentation raised on direct appeal concerning the application of the "use" prong of § 924 (c)(1) to the facts of the

14

facts of this case is appropriate for the following reasons:
First, Watson involves an interpretation of the substantive
criminal statute at issue on direct appeal [§ 924 (c)(1)] that
clarifies not only that the direct appeal was wrongly decided,
but that Petitioner has been convicted and punished for an
act[s] that the law does not make criminal; Second, because
the Watson decision is virtually identical in form and effect
as the Bailey Court's analysis of 924 (c), it applies retro-
actively to all cases on collateral review, (Accord Triestman,
124 F.3rd at 368, n.7); Third, despite the intervening five
year period between this Court's 2003 decision in Cox and the
Supreme Court's interpretive decision in Watson, the Federal
Court's interest in finality must yield to the imperative of
correcting a fundamentally unjust incarceration, especially
where the Court wrongly decided the issue squarely raised on
direct appeal, and the record evidence establishes actual
innocence by clear and convincing evidence.  Thus, these cir-
cumstances indeed present the kind of "grave, unforseen contin-
genc[y]" that makes [reconsideration] appropriate.

F.  The Retroactivity of Watson

No lengthy analysis is needed to determine whether Watson is
to be applied retroactively.  The Supreme Court has had occa-
sion to visit this issue ruling in the context of another de-
fendant.  In Bousley v. United States, 523 U.S. 614 (1998),
the Supreme Court made it clear that Teague's retroactivity bar
applies only to new rules of criminal procedure, not to changes

15

in substantive law.  Bousley applied this reasoning to find
the Teague doctrine inapplicable to a section 2255 Movant's
reliance on Bailey v. United States, 516 U.S. 137 (1995), an
intervening decision construing a sentencing-enhancement pro-
vision in 18 U.S.C. § 924 (c)(1994).  Prior to Bousley, (as
in the instant case), the circuits had "split...over the per-
missibility of post- Bailey collateral attack on § 924(c)(1)
convictions obtained prior to guilty pleas."  Bousley, supra
at 618, n.6.

"A judicial construction of a statute is an authoritative
statement of what the statute meant before as well as after
the decision giving rise to that construction."  Rivers v.
Roadway Express, Inc., 511 U.S. 312-13 (1994).

In Fiore v. White, 531 U.S. 225 (2001), the Supreme Court ex-
plained that where a State's highest Court for the first time
interprets a criminal statute to require proof of a particular
element and that interpretation does not create new law but
merely clarifies what the law was at the time of a defendant's
conviction, there is "no issue of retroactivity."  Id. at 228.
In sum, the Court's interpretation of the proof required must
be applied on collateral review to prevent a violation of Due
Process Clause of the Fifth Amendment, which guards against
convicting a defendant without proof beyond a reasonable doubt
on each element of his crime.  Id.at 228-229.  Jackson v. Vir-
ginia, 443 U.S. 307, 316 (1979); In Re Winship, 397 U.S. 358,
364 (1970).  Therefore, Petitioner is entitled to benefit from
the Watson interpretation of 18 U.S.C. § 924 (c).  See also,

Dixon v. Miller, 293 F.3rd 74, 79 (2nd Cir.2002)(Court's new interpretation of statute must be applied on collateral review to prevent a violation of the Due Process clause).

## CONCLUSION

New legal developments set forth herein suggest a colorable claim of actual innocence and compels re-opening the original § 2255 proceedings.   The law case doctrine does not preclude reconsideration of a second appeal of claim rejected in earlier appeal, but strengthened by intervening legal changes.  Davis, 417 U.S. at 341-42.  Thus, relief is proper in this case because the application of new law is necessary to prevent a manifest injustice.

Respectfully Submitted,

Clinton Cox, Pro-se                         6-18-08

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the instant motion for relief of judgement pursuant to 28 U.S.C. § 1651 and Federal Rules Of Civil Procedure, Rule 60(b), by depositing the contents thereof in the institutional mailing system, in a properly addressed envelope to ensure delivery First Class mail to:
                    Mr. William M. Brown, Jr. (A.U.S.A.)
                         District of Connecticut
                    915 Lafayette Blvd., Room 309
                         Bridgeport, CT  06604


Clinton Cox, Pro-se